# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 11, 2007

## STATE OF TENNESSEE v. ANTONIO CURRIE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-05702    W. Otis Higgs, Jr., Judge**

___

**No. W2006-02764-CCA-R3-CD  - Filed October 3, 2007**

___

The defendant, Antonio Currie, was convicted of voluntary manslaughter, a Class C felony, and sentenced as a Range II, multiple offender to seven years in the county workhouse. On appeal, he argues that the evidence is insufficient to support his conviction and that the trial court erred in denying probation. Based on our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Robert Wilson Jones, Shelby County Public Defender; Tony N. Brayton, Assistant Public Defender (on appeal); and Robert Felkner, Assistant Public Defender (at trial), for the appellant, Antonio Currie.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Thomas Hoover and Marianne Bell, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

A Shelby County Grand Jury indicted the defendant for second degree murder as a result of the shooting death of Carlos Lipsey on May 27, 2005. Following a jury trial, the defendant was convicted of the lesser-included offense of voluntary manslaughter.

**State's Proof**

Glenn Lipsey, the victim's brother, testified that the victim had been in a relationship with Mattie Johnson for about fifteen years and was living with her at the time of his death. He said the victim considered Ms. Johnson's son, Marquez Johnson, to be his stepson. The victim once told Lipsey that he and the defendant had argued about Ms. Johnson and that the defendant had struck him. Lipsey acknowledged that he had never witnessed any arguments between the defendant and the victim.

Sixteen-year-old Marquez Johnson testified that the victim was his stepfather, that he had met the defendant about two weeks prior to the victim's death, and that the defendant had given him a tattoo. Johnson said that he learned his mother had been seeing the defendant and acknowledged that the defendant had been to their house. At about 9:00 p.m. on May 27, 2005, the victim called Johnson, asking the whereabouts of Ms. Johnson and saying that a man had left threatening messages on his phone. The victim arrived home around 9:30 p.m., and he and Johnson went to the apartment of Johnson's cousin, Lisa Moss, to look for Ms. Johnson. En route, the victim told Johnson that someone had been sending messages to his phone "like you got your blank whipped by a woman and stuff like that." The victim then received a phone call, and the victim told the caller that he was on his way to Moss's apartment complex. When they arrived at Moss's apartment, the victim and Johnson first walked to the back of the building and knocked on the back door but received no answer. They then started walking back toward the front of the building and encountered the defendant. Although it was dark, there was enough lighting that Johnson could see the defendant, and he also recognized the defendant's voice. The defendant asked the victim what he had said about the defendant's mother and then pulled out a gun, which Johnson described as an "automatic pistol" about "nine or ten inches long," and cocked it. The victim gave Johnson his cell phone and told him to call the police if he heard a gunshot. The defendant then put the gun away, and the victim and the defendant began wrestling and trying to "throw punches." Johnson backed away but saw the defendant pull the gun back out, heard a gunshot, and saw the victim fall. He estimated that the victim was about two and one-half to three feet from the defendant when he fell. Johnson said he later gave a statement to the police and identified the defendant from a photographic lineup. He said that the victim had been violent in the past, but he had never seen the victim carry a gun or knife.

Marcus Berryman, a crime scene investigator with the Memphis Police Department, testified that he took measurements and made photographs at the scene of the shooting. He identified various photographs from the scene, including one showing a white towel with what appeared to be blood on it. On cross-examination, he acknowledged that the area was dimly lit from the street lights.

Officer Lenez Stepney of the Memphis Police Department testified that he and his partner were the first officers to arrive at the scene of the shooting. They found the victim lying in a grassy area and "blood . . . everywhere." In response to information they received from Marquez and Mattie Johnson, the officers went to the defendant's home but did not locate him.

Sergeant Connie Justice of the Memphis Police Department testified that she took a statement from the defendant after advising him of his rights. The defendant denied any involvement in the shooting and provided the names of alibi witnesses. Sergeant Justice telephoned two of the alibi witnesses, but their stories did not match the defendant's. She subsequently took typewritten statements from the witnesses who told her that the defendant was at a party the night of the shooting, but "it was not within the time frame that the murder happened that [the defendant] was at the party." On cross-examination, she acknowledged that there was no forensic evidence linking the defendant to the crime.

Lisa Moss, Mattie Johnson's cousin, testified that around 9:00 p.m. on May 27, 2005, the defendant came to her daughter's apartment, where Moss was staying, looking for Ms. Johnson. After informing the defendant that Ms. Johnson was not there but might be at the home of her mother who lived in the same apartment complex, Moss and the defendant walked to her mother's apartment but did not find Ms. Johnson. While Moss and the defendant were walking, the victim called the defendant. Moss could hear "loud talking on the other end" and could tell that the victim was mad from the tone of his voice. Moss heard the defendant tell the victim that he was at the apartment complex. The defendant then told Moss that he was "going to bust a cap" in the victim's "rear end" and that "if this nine don't get him this thirty-eight will." However, Moss did not see the defendant with any weapons that night. After Moss and the defendant arrived back at her daughter's apartment, the defendant got into a red car, but Moss did not see him leave. Moss was inside her daughter's apartment watching television when she heard a gunshot. She ran outside and found the victim, who had blood coming from his chest, lying on the ground. She said the victim was still alive when she reached him, and she applied pressure to his wound with a towel. She said the victim died before the ambulance arrived.

Dr. Joye Carter testified that she performed the autopsy on the victim's body and determined that the cause of death was a gunshot wound to the chest and the manner of death was homicide. She said the bullet entered the left side of the victim's chest, went through the left lung, tore the pulmonary artery, and exited out the back in the midline a few inches lower than it went in. In Dr. Carter's opinion, the victim's gunshot wound was caused by a small-caliber handgun. She acknowledged that the victim's wound was not a contact wound and estimated that the gun was fired from a distance of at least eighteen inches away.

**Defense Proof**

Laron Walker, the defendant's cousin, testified that on the night of the shooting, he went to the defendant's birthday party which was being held at the home of another cousin's girlfriend. The defendant was there when Walker arrived at about 9:40 p.m., and he and Walker grilled steaks together from about 10:00 p.m. to 11:00 p.m. Walker said that he remained at the party until about 3:00 a.m. and that the defendant never left the party.

Jervis Spencer, the defendant's cousin, testified that he arrived at the defendant's birthday party around 7:30 p.m. and that the defendant was there when he arrived. Spencer said that he left the party between 11:00 and 11:30 p.m. and that he never saw the defendant leave the party.

Sonya Harris testified that the defendant's brother, Kevin, was her boyfriend and that on May 27, 2005, the two of them hosted a birthday party for the defendant at her apartment. She said that she and Kevin arrived home at the apartment between 7:45 and 8:00 p.m. and that the defendant and his children arrived about fifteen minutes later. She said the defendant was still at the party when she went to bed at about 11:45 p.m., and she was "sure" that the defendant never left the party. According to Ms. Harris, the defendant did not have a car at the time, but his mother had a red Hyundai.

Kevin Currie, the defendant's brother, testified that the defendant and his children arrived at the party at about 8:00 p.m. He said the defendant remained at the party until about midnight when he left with "Taccoria" to go pick up a family friend. Currie said he told the police that the defendant was with him that night. He acknowledged that the defendant drove their mother's red car occasionally but denied seeing it at Ms. Harris' apartment the night of the party. Currie said that his mother was out of town the night of the defendant's birthday party and that her car should have been parked in her driveway.

The defendant elected not to testify.

## ANALYSIS

At the outset, we note that the defendant has raised two issues on appeal: (1) whether the evidence is sufficient to support his conviction; and (2) whether the trial court erred in denying probation. However, in his brief, he makes no argument as to the denial of probation issue. Accordingly, that issue is waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief shall contain an argument regarding the issues presented and the reasons why the issues require appellate relief).

The defendant argues that the evidence is insufficient to support his conviction for voluntary manslaughter, asserting that there was no physical evidence linking him to the crime and that the only evidence was the identification by Marquez Johnson.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185,

190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (2006). Viewed in the light most favorable to the State, the evidence established that both the defendant and the victim had a relationship with Mattie Johnson and had exchanged telephone calls on the night of the shooting. The defendant went to the apartment belonging to Lisa Moss's daughter to look for Ms. Johnson and told Moss that he was going to "bust a cap" in the victim's "rear end" and that "if this nine don't get him this thirty-eight will." Marquez Johnson testified that, when he and the victim encountered the defendant at the apartment complex, the victim and the defendant started wrestling. Johnson saw the defendant pull out a pistol, heard a gunshot, and saw the victim fall. Johnson testified that he had met the defendant about two weeks prior to the shooting and that the defendant had given him a tattoo. Although the area where the shooting occurred was dimly lit, Johnson said he could still see the defendant and recognized his voice. We conclude, therefore, that the evidence was sufficient for a rational trier of fact to find the defendant guilty of voluntary manslaughter.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-5-